# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 25, 2021

Lyle W. Cayce
Clerk

No. 20-50474

Ricky Danell Lockhart,

*Plaintiff—Appellant*,

*versus*

Republic Services, Incorporated; Republic Waste Services of Texas, Limited; Allied Waste Systems, Incorporated; Kenny Ramzinski; Ryan Whiteside; BFI Waste Services of Texas, L.P., doing business as Allied Waste Services of San Antonio, doing business as Republic Services of San Antonio,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CV-766

Before Wiener, Dennis, and Duncan, *Circuit Judges*.

Wiener, *Circuit Judge*:*

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-50474

Plaintiff-Appellant Ricky Danell Lockhart appeals the district court's grant of summary judgment in favor of his former employer, Defendant-Appellee Republic Services, Inc. ("Republic"). Lockhart has raised no genuine issues of material fact with respect to either his claims of racial discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") or overtime violations and retaliation under the Fair Labor Standards Act ("FLSA"), so we affirm.

## I. BACKGROUND

Ricky Danell Lockhart, an African American man, worked for Republic as a roll-off driver before being fired in November 2017. In that job, he provided waste removal service to Republic's customers in San Antonio, Texas. Republic's drivers were paid on a piece-rate basis, also known as "can pay," which was computed weekly by multiplying the individual driver's personal "can rate" (determined by that driver's experience and seniority) by each haul's "can value" (based on the location of the can, its distance from the landfill, and the difficulty of the haul).[1] Can values were set by Republic and communicated to the drivers on a detailed spreadsheet. At the end of the day, each driver filled out a route sheet, recording the containers he had hauled that day and the values associated with each haul. Drivers also clocked in and out of work every day.

In 2017, Republic General Manager Ryan Whiteside selected Lockhart to participate in the 2017 ROAD-EO, an annual event designed to showcase the company's best drivers. At the ROAD-EO in Phoenix, Arizona, Lockhart complained to a Republic District Manager about his can pay. Back

---

[1] Republic illustrates this payment system as follows: "For example, if Lockhart's can rate was $15 and a particular haul was valued at three cans, Lockhart was paid $45 for that haul."

in San Antonio, Lockhart discussed his complaint with Whiteside. Lockhart believed that he and his colleagues were not being properly compensated for each haul they completed because the company classified some hauls as container "swaps," rather than "dump and returns." A swap occurs when a driver travels to a customer's location with an empty container, exchanges the empty container for the full container, and takes the full container to the landfill. This trip involves two legs. A dump-and-return involves traveling to a customer's location, picking up and transporting the full container to the landfill, and returning the empty container to the customer's location. This trip involves three legs. Because a dump-and-return involves more travel, it is compensated at a higher rate. Although Republic predetermined how a particular can was to be treated, Lockhart believed that he could be more productive if he could decide whether to treat a given haul as a swap or a dump-and-return while he was still in the field.

Shortly after returning from the ROAD-EO, Lockhart was involved in four separate disciplinary incidents. Republic uses a progressive discipline plan to address employee infractions: The first infraction elicits an oral warning; the second a written warning; the third a suspension; the fourth the termination of employment. Kenny Ramzinski, Lockhart's supervisor, orally reprimanded Lockhart in April 2017 for recording the incorrect container pay on his route sheets. Lockhart next received a warning in June of that year for abuse of company equipment, charging him with causing more than $4,000 in damage to his company-owned vehicle by pushing the truck's "regen button" in excess of forty times. A few months later, Lockhart was suspended for (1) discussing his personal vehicle with an on-duty mechanic, (2) refusing to wear personal protective equipment as required, and (3) being insubordinate to Shop Manager Hilda Juarez. Finally, in November 2017, Lockhart was terminated after he entered a landfill through an exit gate, in violation of company policy.

No. 20-50474

Lockhart filed a discrimination charge with the Equal Employment Opportunity Commission, received a Notice of Right to Sue, and filed this lawsuit against Republic, BFI Waste Services of Texas, LP, Republic Waste Services of Texas, LTD., Allied Waste Systems, Inc., Kenny Ramzinski, and Ryan Whiteside (collectively, "Defendants" or "Republic"). Lockhart alleged that he had been discriminated against on the basis of race, religion, and sex, and retaliated against in violation of Title VII and 42 U.S.C. § 1981. He also made claims for overtime violations and retaliation under the FLSA. Following the district court's dismissal of Lockhart's religion and sex discrimination claims, Defendants moved for summary judgment on all remaining claims. The court granted the motion and dismissed Lockhart's case. He timely appealed.

## II. APPLICABLE LAW

Summary judgment grants are reviewed *de novo*, "applying the same legal standards as the district court."[2] The court of appeals must consider "[t]he evidence and inferences from the summary judgment record . . . in the light most favorable to the nonmovant."[3] Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] "A fact is material if it 'might affect the outcome of the suit,'" and "[a]

---

[2] *Petro Harvester Operating Co. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020) (quoting *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009)).

[3] *Minter v. Great Am. Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005).

[4] FED. R. CIV. P. 56(a).

No. 20-50474

factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[5]

## III. ANALYSIS

On appeal, Lockhart contends that the evidence creates genuine issues of material fact as to whether he was (1) fired because of his race; (2) paid overtime in compliance with the FLSA; and (3) retaliated against for complaining of Republic's refusal to pay him in accordance with the FLSA.

### A. Title VII

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."[6] When a claim relies on circumstantial evidence, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[7] Under that framework, the plaintiff must establish a prima facie case of discrimination.[8] If he does, the burden "shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions."[9] If a legitimate explanation is offered by the employer, the plaintiff may nevertheless defeat summary judgment by establishing

---

[5] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] 42 U.S.C. § 2000e-2(a)(1). Because Title VII and § 1981 are "parallel causes of action" that "require the same proof to establish liability," *Harville v. City of Houston, Miss.*, 945 F.3d 870, 874 n.10 (5th Cir. 2019) (quotation marks omitted), this opinion discusses only Lockhart's Title VII claim.

[7] Lockhart concedes that this is not a direct evidence case.

[8] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

[9] *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).

either that (1) the proffered reason is pretextual or (2) "the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic."[10]

We can decide this case on the basis of pretext, so we assume, *arguendo*, that Lockhart has established a prima facie case of racial discrimination. A plaintiff pursuing a racial discrimination claim under *McDonnell Douglas* typically must establish that he "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."[11]

The vast majority of our cases concerning *McDonnell Douglas* in a racial discrimination context recite the elements in this fashion, but a handful of cases employ a broader formulation. For example in *Autry v. Fort Bend Independent School District*, we defined the fourth element as requiring proof that the employer "either gave the promotion to someone outside of that protected class or *otherwise failed to promote the plaintiff because of his race*."[12] Similarly, in *Ebbs v. Folger Coffee Co.*, we required evidence that the plaintiff "was replaced by a person outside the protected class or . . . *otherwise that his discharge was due to race*."[13] In light of this apparent confusion and the fact

---

[10] *Id.* (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

[11] *McCoy*, 492 F.3d at 556.

[12] 704 F.3d 344, 347 (5th Cir. 2013) (emphasis added); *see also Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 (5th Cir. 2001) (defining the fourth element in similar terms).

[13] 140 F.3d 1037, at *2 (5th Cir. 1998) (unpublished) (emphasis added); *see also Nguyen v. Univ. of Tex. Sch. of Law*, 542 F. App'x 320, 323 (5th Cir. 2013) (unpublished) (defining fourth element in similar terms).

that "[t]he *McDonnell Douglas* rule was intended to be a flexible one,"[14] clarification of the proper legal standard for such claims might be necessary in short order. But because we can resolve this case on simpler grounds, we decline to do so today.

Assuming that Lockhart has set forth a prima facie case, Republic satisfied its burden of providing a nondiscriminatory reason for Lockhart's termination. It asserted that he was fired in compliance with the company's progressive discipline policy after committing four disciplinary infractions in a twelve-month period.

To rebut Republic's explanation, Lockhart had to demonstrate that the proffered reason was pretextual by showing that the explanation for his termination was "false or unworthy of credence."[15] Such evidence "must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient."[16] Evidence that a proffered explanation is false, coupled with a prima facie case, permits a jury to find that intentional discrimination occurred. It does not, however, compel such a conclusion in every case: There are cases in which, despite such evidence, "no rational factfinder could conclude that the action was discriminatory."[17]

---

[14] *Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1100 (5th Cir. 1985); *see also McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

[15] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (quotation marks omitted) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).

[16] *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (quoting *EEOC v. La. Off. of Cmty. Servs.*, 47 F.3d 1438, 1443–44 (5th Cir. 1995)).

[17] *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Lockhart contends that (1) the "highly contested" nature of the events leading to his termination and (2) evidence of racial slurs used by Republic employees, including his supervisor, Ramzinski, demonstrate that Republic's explanation for his termination was false. We disagree.

The contested nature of Lockhart's violations is insufficient to establish that his termination was pretextual. Lockhart disputes the underlying basis for three of the disciplinary violations he received. He stresses, for example, that (1) he never abused his truck's regen button, (2) it was common practice for drivers to speak to mechanics about their personal vehicles, and (3) the exit gate to the landfill was not properly marked. But Title VII does not allow us to second guess an employer's reasonable business decisions.[18] We have noted that "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones."[19]

There is no evidence that Ramzinski did not reasonably believe Lockhart had committed these infractions before he was disciplined. Ramzinski's decision to discipline Lockhart was, in all three disputed instances, based on the reports of third parties. With respect to the equipment abuse incident, it is undisputed that a third-party mechanic reported that the regen button had been pushed over forty times and that Lockhart had driven that truck on all but five days in the eleven-week period preceding the mechanical issue. As to the incidents of insubordination

---

[18] *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (citing *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)).

[19] *Id.*; *see also Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.").

reported by Juarez, "[i]n cases in which an employer [disciplines] an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but 'whether the employer reasonably believed the employee's allegation and acted on it in good faith.'"[20] The same is true of the gate incident. Although it is disputed whether Garza gave Lockhart permission to enter the landfill through the exit gate, Ramzinski reasonably believed that Lockhart had not received permission to do so and relied on Garza's report of the infraction in disciplining Lockhart. The factual dispute regarding Lockhart's job performance would thus not permit a reasonable fact finder to conclude that Republic's proffered explanation is false or unworthy of credence.

Evidence that Ramzinski used racial slurs to refer to Lockhart requires closer attention. Discriminatory remarks can constitute circumstantial evidence of pretext if they display discriminatory animus on the part of the person responsible for making the adverse employment decision or someone with influence over that person.[21]

Citing deposition testimony of former employee Juan Puga, Lockhart contends that Ramzinski used a Spanish-language racial slur to refer to Lockhart behind his back.[22] Puga testified that Ramzinski used the slur

---

[20] *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (quoting *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)).

[21] *See McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–58 (5th Cir. 2019) (citing *Squyres v. Heico Cos.*, 782 F.3d 224, 236 (5th Cir. 2015)); *Laxton*, 333 F.3d at 583 (applying this standard in a Title VII case); *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 420–21 (5th Cir. 2009) (unpublished) (same).

[22] Lockhart also contends that Republic was a hostile work environment in which racial slurs were commonplace. However, he never raised a hostile work environment claim. Therefore, evidence that landfill employees often used racial slurs to refer to him and ordered him to dump his haul in dangerous areas of the landfill are irrelevant at this juncture.

No. 20-50474

"multiple times during the day," and that "for him it was a joke. It was something cool."

As an initial matter, we disagree with Republic's contention that Ramzinski's use of the racial slur did not display racial animus simply because he used the term as a joke. The word Ramzinski allegedly used is the Spanish-language equivalent to the n-word, which the Ninth Circuit has described as "perhaps the most offensive and inflammatory racial slur in English,"[23] and "evoking a history of racial violence, brutality, and subordination."[24] Because of such words' history, using them to refer to an individual or group, particularly in the employment context, typically will imply discriminatory animus on the part of the speaker, regardless of whether the speaker believes he uses such words in jest.

Even though use of this slur is relevant to the pretext inquiry, it is nevertheless insufficient to create a genuine issue of fact about the veracity of Republic's proffered explanation. Puga's testimony about Ramzinski's use of the slur is non-specific in time and context. Neither has Lockhart provided evidence that use of the word had any bearing on his termination, especially not in contrast to the ample evidence that Lockhart was terminated, pursuant to company policy, because he committed four disciplinary violations in a

---

[23] *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (quotation omitted).

[24] *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *see also Rhines v. Salinas Constr. Techs., Ltd.*, 574 F. App'x 362, 364 n.2 (5th Cir. 2014) (unpublished) (recognizing that the slur is the Spanish equivalent of the n-word); *Johnson v. PRIDE Indus., Inc.*, No. EP-18-CV-00044-FM, 2018 WL 6624691, at *4 (W.D. Tex. Dec. 18, 2018) ("'Mayate' is an extremely derisive and offensive term used to describe black people and has the same taboo status as the n-word.").

No. 20-50474

twelve-month span.[25] Further, this remark is the only arguable evidence of pretext. As such, it is not probative of discriminatory intent under *Palasota v. Haggar Clothing Co.*[26] We conclude that, at best, this evidence creates only a "weak issue of fact," insufficient to overcome the "uncontroverted independent evidence that no discrimination had occurred."[27]

A Title VII plaintiff can also survive summary judgment with evidence that race was a motivating factor in the adverse employment decision.[28] It is unclear whether Lockhart intends to pursue this theory on appeal. He never argued mixed motives to the district court, and his appellate brief is devoid of any reference to this theory, save for a single cite to *Bostock v. Clayton County, Georgia*,[29] in support of the idea that the district court impermissibly required him to prove that race was "the sole or primary cause" of his termination. Typically, Lockhart's failure to raise the issue in the district court would result in the waiver of this argument.[30] However, even if we entertained the argument on appeal, such a claim would fare no better than Lockhart's pretext claim. The undisputed evidence indicates that Lockhart was terminated in accordance with Republic's progressive disciplinary policy. Nothing in the record suggests that Lockhart's infractions were reported more often or punished more severely than those of other

---

[25] *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012) (finding no issue of fact regarding hostile work environment when the allegedly discriminatory statements were presented with "little detail regarding their nature and context").

[26] 342 F.3d 569, 577 (5th Cir. 2003) ("[S]o long as remarks are not the only evidence of pretext, they are probative of discriminatory intent."); *see also Bissett v. Beau Rivage Resorts Inc.*, 442 F. App'x 148, 154 (5th Cir. 2011).

[27] *Reeves*, 530 U.S. at 148.

[28] 42 U.S.C. § 2000e-2(m); *Alvarado*, 492 F.3d at 611.

[29] 140 S. Ct. 1731, 1748 (2020).

[30] *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007).

employees. The record simply would not allow a reasonable jury to conclude that Lockhart's race had anything to do with his termination.

## B. FLSA

Lockhart contends that Republic violated the FLSA by failing to compensate him properly for overtime hours and by firing him in retaliation for making wage-related complaints. We disagree.

### i. Overtime Violations

The FLSA obligates employers to pay non-exempt employees no less than one and a half times their "regular rate" of pay for all overtime hours worked, *i.e.*, for all hours worked in excess of forty hours per week.[31] The "'regular rate' under the Act is a rate per hour," so when an employee is paid on a basis other than hourly, the employee's "compensation must be converted to an hourly rate" before overtime can be properly assessed.[32] The "regular rate" for a piece-rate employee like Lockhart "is computed by adding together total earnings for the workweek" and dividing that sum by "the number of hours worked in the week."[33]

With respect to piece-rate workers, "[i]n determining the number of hours for which overtime compensation is due, all hours worked . . . in a particular workweek must be counted."[34] Although it is unlawful for an employer to fail to count and pay an employee for nonproductive hours, such

---

[31] 29 U.S.C. § 207(a)(1); *see also Hills v. Entergy Operations, Inc.*, 866 F.3d 610, 614 (5th Cir. 2017) (quoting *O'Brien v. Town of Agawam*, 350 F.3d 279, 294 (1st Cir. 2003)) ("Calculation of the correct 'regular rate' is the linchpin of the FLSA overtime requirement.").

[32] *Hills*, 866 F.3d at 614 n.13; *id.* at 614; *see also* 29 C.F.R. § 778.109.

[33] 29 C.F.R. § 778.111(a).

[34] *Id.* § 778.315.

No. 20-50474

as time "spent in waiting . . . [or] time spent in travel on the employer's behalf,"[35] "it is permissible for the parties to  agree  that  the  pay  the employees will earn at piece rates is intended to compensate them for all hours worked, the productive as well as the nonproductive hours."[36]

Lockhart contends that Republic violated overtime laws by mischaracterizing the can values associated with particular hauls, which had the effect of reducing his overall piece rate and the overtime rate based on it. He also claims that his "overtime premium was improperly diluted" by non-productive hours spent on the clock.

As an initial matter, there is no record evidence that Republic miscalculated can values in the fashion Lockhart suggests. Contrary evidence is clear: Roll-off drivers were given a spreadsheet that indicated the value associated with each particular can haul and were instructed to record that predetermined value on their route sheets at the end of each day. Although Lockhart might believe that the values assigned to particular hauls undervalued his work or failed to properly consider the amount of time a particular haul took to complete, there is no evidence that Republic paid less for a particular can than it had promised.

Whether Lockhart agreed that his piece rate was intended to compensate him for nonproductive time is a more nuanced question. FLSA regulations do not specify what is required for the existence of such an agreement, and there is little caselaw addressing the matter. However, a recently issued guidance letter from the Department of Labor ("DOL") is instructive. In that letter, the DOL explained that it is lawful for an employer to use a piece rate system designed to cover both productive and

---

[35] *Id.* § 778.318(a).

[36] *Id.* § 778.318(c).

nonproductive time, even without a "specific agreement . . . regarding the . . . method of computing the regular rate and overtime pay."[37] Analogizing to the FLSA's fluctuating workweek provisions, the DOL explained that an agreement requires a "clear and mutual understanding" between the parties about the intended compensation, but that such understanding "may be inferred from the parties' conduct."[38] Further, the employees need not "understand[] the precise mathematical methodology . . . in how the regular rate is computed."[39]

The DOL guidance letter relies heavily on *Espenscheid v. DirectSat USA, LLC*,[40] in which the court considered the existence of an agreement by reference to the FLSA's fluctuating workweek provisions. It noted that when a fixed salary is intended to compensate an employee for all hours worked in a particular week, regardless of the actual number of hours worked, there must be a "clear mutual understanding" between the employer and the employee regarding what the weekly salary is meant to cover.[41] The court reasoned that the existence of an "agreement" with respect to piece rate employees mirrored the "clear mutual understanding" requirement, because "both [systems] insure [sic] that employees are made aware of methods of compensation that depart from the general rules of compensation under the FLSA."[42] Although non-binding, the DOL's approval of this position is

---

[37] U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 30, 2020) at 1.

[38] *Id.* at 2 (citing *Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625-BBC, 2011 WL 10069108, at *29 (W.D. Wis. Apr. 11, 2011)).

[39] *Id.* at 3.

[40] 2011 WL 10069108.

[41] *Id.* at *29 (quoting 29 C.F.R. § 778.114(a)).

[42] *Id.*

persuasive, and we agree that evidence of a "clear mutual understanding" between employer and employee may be inferred from the parties' conduct.[43]

The record demonstrates that (1) Republic's piece rate system was intended to compensate roll-off drivers for both their productive and non-productive time, and (2) Lockhart agreed to be compensated in that fashion. It is undisputed that Lockhart and his fellow drivers' piece rates were determined by multiplying their personal can rate by each haul's can value. For overtime, Republic calculated each driver's hourly rate by dividing the total weekly earnings by the total hours that driver clocked in that week. All hours worked in excess of forty were compensated at one-and-one-half times that hourly rate. The daily route sheets did not require drivers to differentiate between productive and nonproductive time, and there is no evidence that Republic intended to compensate drivers differently for productive and non-productive activities, or communicated as much to its employees.

The record also reflects that Lockhart agreed to being compensated in this manner. For one thing, he testified that, in accepting employment with Republic, he agreed to be paid "just on the can rate," with "no other type of pay like hourly pay." He also accepted payment in this fashion for many years before beginning to complain to his supervisors about his pay.

More importantly, Lockhart's complaints about the pay structure focused not on the productive versus nonproductive time issue, but on the value of each can haul. These are two entirely different grievances. He expressly complained about how specific hauls were classified as swaps rather than dumps-and-returns, believing he could be more productive if he were

---

[43] *See Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636–37 (5th Cir. 2001) ("[T]he FLSA does not require that the 'employer hold an employee's hand and specifically tell him or her precisely how the payroll system works.'" (quoting *Griffin v. Wake Cnty.*, 142 F.3d 712, 717 (4th Cir. 1998))).

allowed to determine how to treat a particular haul while in the field. Ramzinski and others explained the payment system to Lockhart on multiple occasions, clarifying why some hauls were coded as they were. And in fact, Lockhart testified that, after Republic modified the pay plan in 2017 to incorporate his suggestions, he was "real happy" with the adjustment, even though he continued to be paid in the exact same fashion as before (*i.e.*, his piece rate covering both productive and nonproductive time).

Neither is there evidence that Republic ever communicated to its drivers that they would be paid separately for nonproductive time or that Republic ever departed from this payment scheme. However, Lockhart also suggests that *Serrano v. Republic Services, Inc.*[44] demonstrates that there was no such agreement here. In *Serrano*, a group of industrial drivers sued Republic for overtime violations. Following a bench trial, the court concluded that the drivers had not agreed that their piece rate was meant to compensate them for both productive and nonproductive time, citing evidence that (1) no one had ever explained the system to the drivers; and (2) when they complained about not being paid for non-productive time, they were ignored or told that their supervisors would handle the matter. These responses, the *Serrano* court found, "implied a promise of additional compensation or at least a matter that was up for negotiation rather than a pay structure that was set and agreed to."[45] Additionally, the *Serrano* court stressed that Republic's own witnesses took a number of inconsistent positions about the way nonproductive time was compensated, including testifying that:

> (1) there is no non-production time in the waste hauling business; (2) the only non-production time is sick leave or annual leave; (3) Republic does not compensate for down time;

---

[44] No. 2:14-CV-77, 2017 WL 2531918 (S.D. Tex. June 12, 2017).

[45] *Id.* at *11.

No. 20-50474

(4) non-production time is compensated by day rates that are applied for down time over four hours in a day or when production does not exceed the day rate; and (5) all non-production time is included in, and compensated by, the zone rates.[46]

This case is different. Here, Republic's supervisors explained the payment structure to Lockhart on multiple occasions in response to his confusion, and there is no evidence that the company was ever inconsistent in the manner it explained or applied the payment plan.

Finally, the only indication that Lockhart did not agree to this compensation scheme exists in the form of a self-serving declaration that he wrote after Republic moved for summary judgment. In that declaration, Lockhart asserted that he "never agreed that the can rate was supposed to reimburse [him] for both productive and non-productive time." But nowhere in his pleadings did Lockhart make this claim, and his affidavit cannot controvert the ample evidence, cited above, indicating that he understood and agreed to this payment scheme. Furthermore, his declaration itself belies his apparent confusion about the payment scheme. In it, he states:

> [H]ow much I made in overtime was dependent on how much the cans I serviced were worth divided by how many hours I worked to service those cans. In other words, I was paid based on my productivity, not based solely on how many hours I worked. The more cans I picked up and/or the less time I took to pick them up, the more I made per hour, and therefore the more I made in overtime. But not all cans are created equal.

Considering the foregoing, there is simply no evidence from which a reasonable jury could find that Lockhart did not agree to his piece rate covering productive and nonproductive time.

---

[46] *Id.* at *10 (citations omitted).

No. 20-50474

## ii. Retaliation

The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."[47] To establish a prima facie claim for such retaliation, a plaintiff must demonstrate that (1) he participated in an activity protected by the FLSA; (2) he suffered an adverse employment action; and (3) there exists a causal link between the activity and the adverse action.[48]

"[I]f [Lockhart] cannot prove that he was engaged in protected activity . . ., then he cannot make out a viable claim under the FLSA."[49] "[A]n informal, internal complaint may constitute protected activity,"[50] as may an oral complaint,[51] but "not all 'abstract grumblings' or vague expressions of discontent are actionable."[52] To constitute protected activity, the informal complaint must "concern some violation of the law"[53] that puts the employer on "notice that [the] employee is making a complaint that could subject the employer to a later claim of retaliation."[54]

---

[47] 29 U.S.C. § 215(a)(3).

[48] *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008).

[49] *Id.*

[50] *Id.* at 625.

[51] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

[52] *Hagan*, 529 F.3d at 626 (quoting *Hagan v. Echostar Satellite, L.L.C.*, No. H–05–1365, 2007 WL 543441, at *4 (S.D. Tex. Feb. 16, 2007)).

[53] *Id.* (holding that the plaintiff had not engaged in protected activity because his informal complaint involved only the "*possibility* of field technicians receiving less overtime pay," but "did not frame *any* of his objections in terms of . . . potential illegality").

[54] *Kasten*, 563 U.S. at 13.

Lockhart's informal complaints are not protected by the FLSA. All of his complaints to management focused on the value of different can hauls, meaning that he was complaining about the *amount* of his compensation. In calling for allowing drivers to determine whether a haul should be treated as a swap or as a dump-and-return, Lockhart was advocating for increasing the *value* of his work. He was not suggesting that Republic's manner of calculating the hauls was *unlawful*. True, a change in the value of a driver's hourly rate would necessarily impact his overtime rate, but that does not mean that Lockhart's complaints were reasonably understood as a challenge to the lawfulness of Republic's compensation scheme.[55] Both Ramzinski and Whiteside testified that Lockhart never mentioned overtime pay, but focused his complaints only on specific can values, which he believed should have been higher. Because Lockhart did not engage in a protected activity under the FLSA, summary judgment rejecting this claim was appropriate.

## IV. CONCLUSION

Based on the foregoing, the judgment of the district court is AFFIRMED.

---

[55] *See id.* at 14.